**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

**JULIA COHEN**,

                         Plaintiff,

     -against-                               05 CV 6780
                                                     (RJS)(JCF)

**THE CITY OF NEW YORK**,

                      Defendants.           FILED VIA ECF

**AND RELATED RNC CASES**

-----------------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION**
**TO MOTION TO ENFORCE SUBPOENA AND**
**IN SUPPORT OF CROSS MOTION TO QUASH**

**PRELIMINARY STATEMENT**

This memorandum is respectfully submitted by the non-party National Lawyers' Guild, New York City Chapter ("NLG-NYC") in opposition to the March 14, 2008 letter-motion of the City of New York to enforce a subpoena *ad testificandum* and *duces tecum* dated January 18, 2008 and in support of the NLG-NYC's cross motion to quash said subpoena.

The NLG-NYC relies upon the facts set forth in the accompanying declarations of Robert J. Boyle, Esq. and Bruce K. Bentley, Esq. as well as prior submissions of the NLG-NYC in this and related actions.

1

## ARGUMENT

## POINT I

### THE DOCUMENTS AND TESTIMONY REQUESTED BY THE SUBPOENA ARE PROTECTED FROM DISCLOSURE BY THE ATTORNEY WORK PRODUCT PRIVILEGE.

**1. The Standard**

Fed.R.Civ.P. 26(b)(3) provides that a party may discover documents and tangible things

> prepared in anticipation of litigation or for trial…only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.  In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

First recognized over sixty years ago in the seminal case of *Hickman v. Taylor*, 329 U.S. 495 (1947), the attorney work-product doctrine

> establishes a "zone of privacy" in which a lawyer can prepare and develop theories and strategies with an eye towards litigation free from unnecessary intrusion by his or her adversaries.

*Lugosch v. Congel*, 219 F.R.D. 220, 239 (N.D.N.Y. 2003) citing *United States v. Aldman*, 68 F.3d 1495, 1500-01 (2nd Cir. 1995)(*Aldman I*) citing

*Hickman v. Taylor*, 329 U.S. at 510-511. The need for the privilege is obvious. If an attorney's work were accessible to an adversary "much of what is now put down in writing would remain unwritten" for fear that it would be disclosed to an opposing party. *Hickman v. Taylor*, 329 U.S. at 511. Thus, the "strong public policy" behind the privilege has been re-affirmed by the Supreme Court numerous times in the decades since *Hickman*. *United States v. Adlman*, 134 F.3d 1194, 1197 (2nd Cir. 1998)(*Adlman II*) (collecting cases).

The attorney work product privilege is broader than the attorney-client privilege. *In re Grand Jury Proceedings*, 219 F.3d 175, 190 (2nd Cir. 2000). It protects the mental impressions of the attorney as well as the attorney's opinions concerning litigation. This aspect of the privilege is commonly referred to as "opinion work product" and, under Fed.R.Civ.P. 26(b)(3) is fully protected from disclosure. *United States v. Adlman*, 134 F.3d at 1197; *Horn & Hardart v. Pillsbury Co.* 888 F.2d 8, 12 (2nd Cir. 2000). The privilege also protects "fact work product". Such work product includes, but is not limited to, the results of factual investigation conducted by an attorney and those acting on the attorney's behalf. *Hickman v. Taylor*, 329 U.S. at 512-513 (production of attorney's recollections as well as written memoranda of witness interviews protected); *United States v. Nobles*, 422

U.S. 225, 238-239 (1975)(work product applies to attorney's agents); *Sterling Drug v. Harris*, 488 F.Supp. 1019 (S.D.N.Y. 1980)(privilege extends to documents prepared by agent of attorney responsible for coordinating and gathering evidence). Fact work product may not be ordered disclosed unless the requesting party makes a showing of "substantial need" and where it would be unduly burdensome to obtain the information from other sources. Fed.R.Civ.P. 26(b)(3).

To be covered by the privilege, litigation need only be <u>anticipated</u>. Indeed, material may be covered by the work product privilege even though it was created before the events giving rise to the litigation. *United States v. Adlman*, 68 F.3d at 1501.

## 2. NLG-NYC Legal Observer Notes And Cover Sheets Fall Within The Privilege.

The burden of establishing that the attorney work product doctrine applies rests with the party asserting it. However, that burden is "not a heavy one", *Lugosch v. Congel*, 219 F.R.D. at 239. It is easily satisfied herein.

The NLG-NYC anticipated, correctly, that the demonstrations and protests planned to coincide with the 2004 Republican National Convention (RNC) would result in criminal and civil litigation. Indeed, the City of New York, through its prosecutorial and law enforcement agencies publicly

4

announced its expectation that hundreds, if not thousands of civilians would be arrested during that four-day period (Bentley ¶13).   The NLG-NYC realized that there would be a need to represent arrestees both at arraignment and subsequently.  Lawyers were recruited for this task (Bentley ¶14-15).  In addition, a "Writ Squad" of NLG attorneys was created to assure that those who were arrested were arraigned within a reasonable time.  That Writ Squad ultimately brought a writ of *habeas corpus* in the name of the National Lawyers Guild that resulted in the release of hundreds of protesters and a contempt adjudication against the City of New York (Bentley, ¶¶14, 17).

  Critical to all this work were the NLG-NYC attorney's agents, the legal observers.  Long before the RNC, NLG-NYC attorneys recruited lawyers, law students and other interested persons both inside and outside the NLG to be present on the street that weekend (Bentley ¶¶14-15).  All potential legal observers were required to attend a training session conducted by an NLG attorney.   Legal observers were instructed, *inter alia*,  1) to record the names of those arrested so that they could be tracked through the criminal justice system and eventually assigned an attorney for arraignment 2) to record the badge numbers of police involved in any arrests and, 3) to identify and note witnesses to arrests and/or police misconduct (*Id*.).   Note

forms, identifying the notations as attorney work product were given to legal observers until the NLG-NYC ran out of forms (*Id.*, Bentley Dec. Ex. A). All legal observers were required to sign a confidentiality agreement whereby they agreed not to disclose their observations and/or notes to third parties absent a court order (Bentley Dec. Ex. B).   At the conclusion of their assignment, the notes were turned over to the NLG-NYC.  They were summarized and indexed on cover sheets by attorneys and persons working under the supervision of attorneys primarily for use in defending criminal actions (Bentley ¶16).

Each of the categories of documents is protected from disclosure. Legal observer notes memorializing the identities of eyewitnesses to arrests and/or interviews with them fall squarely within the work product privilege. *Hickman v. Taylor*, *supra.; United States v. Nobles*, *supra*.  Moreover, in the unique context of the RNC demonstrations, notes memorializing the observations of legal observers themselves are also privileged.  Materials produced or information possessed by an agent working for an attorney may be protected as work product "when disclosure of such information would reveal the attorney's own thinking and strategy, ie. opinion work product". *United States of America v. District Council of New York City*, 1992 WL 208284*9 (S.D.N.Y. 1992), citing *United States v. Nobles*, 422 U.S. at 239-

6

39. Each legal observer was instructed by an attorney to note certain types of information on a form whether based upon their own observations or obtained from third parties (Bentley ¶15). Their notes necessarily memorialize the "mental impression" and/or theories developed by an attorney in anticipation of criminal and/or civil litigation. Accordingly, they, too, are covered by the privilege and are fully protected from disclosure. Fed.R.P. 26(b)(3) ("the court shall protect against disclosure the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation"). *See also In re Grand Jury Subpoenas Dated Octiober 22, 1991 and November 1, 1991*, 959 F.2d 1158 (2nd Cir. 1992)(production of unprivileged documents may be protected if disclosure would result in exposure of counsel's thought processes).

Accompanying each legal observer note is a cover sheet (Boyle ¶¶ 6-8). That sheet was created by an NLG attorney or an agent of that attorney after review of the notes (Bentley ¶16). Accordingly, the index is a "mental impression" of the attorney and under Fed.R.Civ.P. 26(b)(3), is fully protected from disclosure. *Hickman v. Taylor*, 329 U.S. at 511 (part of attorney's duties is to "sift" through evidence without undue interference).

The NLG-NYC was not merely the repository of legal observer notes as the City's March 14, 2008 letter suggests. NLG-NYC attorneys recruited legal observers in anticipation of the criminal defense litigation that would arise from the thousands of arrests that the City itself announced would occur during the RNC. NLG-NYC attorneys trained the legal observers about what to record and how to record it. The NLG-NYC insisted that the notes be returned to the NLG-NYC for processing and review by attorneys and paralegals for use in litigation.

The attorney work product privilege was not waived when some legal observer notes were disclosed outside the NLG-NYC. It has been widely recognized that contrary to the attorney-client privilege, the attorney work product privilege is "less readily waived". *Bowne of New York City, Inc. v. AmBase*, 150 F.R.D. 465, 479 (S.D.N.Y. 1993).

> As articulated by most courts, such a waiver will be found only if the party has voluntarily disclosed the work-product in such a manner that it is likely to be revealed to his adversary. Thus, disclosure simply to another person who has an interest in the information but who is not reasonably viewed as a conduit to a potential adversary will not be deemed a waiver of the protection of the rule. *See, e.g. Westinghouse Elec.Corp. v. Republic of the Phillippines*, 951 F.2d at 1428; *United States v. Gulf Oil Co.*, 760 F.2d 292, 295-96 (E,.Ap. 1985); *United States v. AT & T Co.,* 642 F.2d at 1299; *GAF Corp. v. Eastman Kodak Co.*, 85 F.R.D. 46,

>52 (S.D.N.Y. 1979); *Stix Prods., Inc v. Merchants & Mfrs. Inc.* 47 F.R.D. 334, 338 (S.D.N.Y. 1969).

*Id*. at 479 (internal citiations included). *See also In re Cooper Market AntiTrust Litigation*, 200 F.R.D. 213, 221, n.6 (S.D.N.Y. 2001). Thus, disclosure to one who has only a personal interest in the material does not result in a waiver where it cannot be reasonably expected that it would lead to disclosure to an adversary. *United States v. Stewart*, 287 F.Supp.2d 461, 468-469 (S.D.N.Y. 2003). Disclosure to criminal defense attorneys who were litigating against a common adversay – the City – cannot be deemed a waiver. Likewise a waiver cannot be implied from disclosure to I-Witness Video, an organization used by the NLG-NYC to assist with the processing of copying videos that were given to the Guild.

### 3. The Information Requested By The Testimonial Subpoena Is Protected Work Product.

The City's subpoena requests that the NLG-NYC designate a person to testify about

> The NLG's practices concerning the collection and handling of videotapes, photographs, notes and any other evidence (or potential evidence) relating to any arrests [around the time of the RNC] whether those materials were provided by legal observers or other individuals. The designated individual should be prepared to testify about the location, types and volume of such evidence collected by and provided to the NLG; and about the custody of

9

>such evidence from the time it was collected to the present.

The subpoena clearly calls for testimony regarding the NLG-NYC's manner of preparing a case for litigation. This is classic "opinion" work product. As the United States Supreme Court stated in *Hickman v. Taylor*

>In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs and countless other tangible and intangible ways-aptly though roughly termed by the Circuit Court of Appeals in this case "Work Produce of a Lawyer."

*Hickman v. Taylor*, 329 U.S. at 511. The NLG-NYC's manner of collecting and categorizing evidence arising out of the RNC, or indeed, arising out of any of litigation work "is the historical and necessary way in which lawyers act within the framework of our system…" *Id*. By requesting this information, the City of New York – our adversaries in the RNC contempt litigation and the complaining witness, via police officers, in criminal

10

prosecutions that were defended by the NLG-NYC, – is seeking to intrude upon this confidential process. The effect of such disclosure on the NLG's ability to do its work in the future, and the effect on the legal profession as a whole would be, as the Supreme Court observed in *Hickman v. Taylor* "demoralizing. And the interests of the clients and the cause of justice would be poorly served." *Hickman v. Taylor*, 329 U.S. at 394.

**4. The City Has Not Shown A Need For Disclosure**

As outlined above, all of the testimonial and documentary information requested by the subpoena are fully exempt from disclosure. However, even if the legal observer notes, or portions thereof, are deemed fact work product and not fully protected from disclosure under the Rule, the subpoena should still be quashed.

The City has not shown any need, let alone a "substantial need" for the information requested. Nor has the City made any showing that they have been "unable, without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.CivP. 26(b)(3). Indeed, the opposite is true. The City has deposed hundreds of arrestees. The City has access to arresting officers, most of whom have been deposed. The City possesses the hundreds if not thousands of videos created by the NYPD. The plaintiffs have also produced videos. Most significantly, between 2005,

11

when the lawsuits were filed, and November, 2007, when this Court closed fact discovery among the parties, the plaintiffs had identified approximately <u>700 non-party witnesses</u> through Rule 26 disclosures, interrogatory responses and/or at depositions (Boyle Dec. Exhibit A). Yet in all that time, the City has deposed only a few (Boyle ¶16). Clearly, having chosen not to depose witnesses identified by the plaintiff's themselves, the City cannot credibly maintain that they could not secure the information requested by this subpoena from other sources. Accordingly, the *subpoena* should be quashed.

## POINT II

### ENFORCEMENT OF THE SUBPOENA WOULD VIOLATE THE FIRST AMENDMENT RIGHTS OF THE NLG-NYC AND ITS MEMBERS.

In this very litigation, this Court observed that

> The United States Supreme Court recognized in *National Association for the Advancement of Colored People v. Alabam ex rel patterson*, 357 U.S. 449 (1958) that the First Amendment and the Due Process Clause of the Fourteenth Amendment protect against compelled disclosure of membership lists where such disclosure would "abridge the rights of [an organization's] rank-and-file members to engage in lawful association in support of their common beliefs." *Id*. at 460…For this reason, state action which may have the effect of curtailing the freedom to associate is subject to

12

> the closest scrutiny…Accordingly, when an organization resisting disclosure of the identities of its members makes a *prima facie* showing that disclosure would infringe upon tis First Amendment rights, the burden shifts to the party seeking disclosure to show a compelling need for the information. *New York State National Organization for Women v. Terry*, 886 F.2d 1339, 1355 (2nd Cir. 1989). This "[qualified] privilege…[is] designed to protect members of groups from harassment and intimidation and to prevent the 'chilling effect' that disclosure may have on the willingness of individuals to associate with the group." *International Society for Krishna Consciousness, Inc. v. Lee*, No. 75 Civ. 5388, 1985 WL 315 at *8 (S.D.N.Y. 1985).

*Schiller v. The City of New York*, 2006 WL 3592547 at *3-4 (S.D.N.Y. 2006)(Francis, MJ). The *prima facie* showing required to shift the burden to the party seeking disclosure does not require a showing of actual harm. *Id*. citing *N.O.W. v. Terry*, 886 F.2d at 1355. It may be satisfied by "specific evidence of past or present harassment of members due to their associational ties [and/or] harassment directed against the organization itself." *Id.* quoting *Buckley v. Valeo*, 424 U.S. 1, 80 (1976).

As set forth in the accompanying declaration of Bruce K. Bentley, throughout the NLG's seventy-year history, it worked to expand civil liberties and has advocated for those engaging in lawful political dissent from the existing social order. This has included representing civil rights workers, anti-Vietnam War protesters and, more recently, opponents of the

13

war in Iraq and the policies of the Bush administration.  The NLG has itself been the target of illegal government surveillance and counterintelligence (Bentley ¶¶ 4-9 citing  *NLG v. Attorney General*).  Improper information gathering against  the NLG continues today.  During 50-H hearings arising from claims filed after the RNC, attorneys for the City questioned claimants about their relationship to the NLG and their knowledge of the NLG's role in the protests surrounding the convention (Bentley ¶18).

Legal observers have been vitally important to the NLG-NYC's work.  For many years, the NLG has provided individuals, organizations, and community groups who engage in public protest and demonstrations the protection of legal observers.  The legal observers include lawyers, law students, and others interested in protecting the right to dissent and to protest under the First Amendment.  Their role is to attend demonstrations and thereby discourage acts of state officials, police officers, or other persons that would interfere with the free exercise of constitutional rights (Bentley ¶11).  In the same way that an independent press can act as a deterrent to police misconduct by their mere presence at public events, legal observers discourage - -  by their presence and their ability to report - - illegal governmental acts.  In hundreds of demonstrations, legal observers have played a useful (and sometimes critical) role in ensuring the protections of

the First Amendment. In situations where arrests are expected, such as in the RNC demonstrations, legal observers have acted under the direction of NLG lawyers. NLG Legal Observers act as representatives of the NLG and as part of the Guild's own exercise of protected rights of speech and association.

In its legal observer activities, the NLG is engaged in fully protected speech and association. Mandating disclosure of legal observers' identities would violate the associational privacy rights of the NLG and the individual legal observers. The legal observers did not give up their right to privacy by attending the demonstrations and it should be their personal decision whether to disclose their identity or information concerning the event. Courts, including this court, have been careful to protect the privacy rights of members of political and other activist organizations. See, e.g., *NAACP v. Alabama ex rel. Patterson*, *supra*.; *Pleasant v. Lovell*, 876 F.2d 787, 795 (10th Cir. 1989); *Grandbouche v. Clancy*, 825 F.2d 1463, 1465-67, (10th Cir. 1987); *Adolph Coors Co. v. Movement Against Racism*, 777 F.2d 1538 (11th Cir. 1985); *In re First Nat. Bank, Englewood, Colo.*, 701 F.2d 115, 117-18 (10th Cir. 1983)(government must show "compelling need" to justify a subpoena for documents identifying organization's members); *Black Panther Party v. Smith*, 661 F.2d 1243 (D.C. Cir. 1982), vacated on other

grounds, *Moore v. Black Panther Party*, 458 U.S. 1118 (1982) (reversing dismissal of lawsuit and remanding for determination whether First Amendment privilege shielded plaintiff from defendant's discovery request for production of mailing list and membership list); *Savola v. Webster*, 644 F.2d 743 (8th Cir. 1981); *Schiller v. City of New York, supra.*; *State of Wyoming v. United States Dept. of Agriculture*, 208 F.R.D. 449 (D.D.C. 2002); *International Action Center v. United States*, 207 F.R.D. 1 (D.D.C. 2002).

As the *International Action Center* court stated, quoting *Black Panther Party*, 661 F.2d at 1268, in conducting this balancing, the district courts are directed to first:

> Consider the relevance of the information sought. The interest in disclosure will be relatively weak unless the information goes to the heart of the matter,' that is, unless it is crucial to the party's case [citations omitted]. Mere speculation that information might be useful will not suffice; . . . .Second, courts must determine whether the litigants seeking disclosure have pursued alternative sources. Even when the information sought is crucial to a litigant's case, disclosure should be compelled only after the litigant has shown that he has exhausted every reasonable alternative source of information. 207 F.R.D. at 12.

As set forth in Point I *supra*. the City has made no showing of need for the information requested. Indeed, their choice to depose only a few of the 700

16

non-party witnesses identified by the plaintiffs raises an inescapable inference that the instant subpoena is not motivated by a desire to obtain discoverable material but as a means to harass and gain information about the internal workings and membership of the National Lawyers Guild which has been and will be a legal adversary of the City with respect to arrests of political demonstrators, including the arrests made during the RNC. Accordingly, the balance in this case swings strongly against invasions of associational and political privacy.

The right to associational privacy is sufficiently strong to permit even a <u>plaintiff organization</u> to claim protection in litigation it has affirmatively initiated.  See, e.g. *Schiller v. City of New York*, *supra.;  International Action Center v. United States*, *supra*.   In both *Schiller* and *International Action Center*, the plaintiff organization and/or members brought suit alleging violations of constitutional rights from protest-arrests.  In each case, the defendant police department sought membership lists and/or minutes of meetings where the demonstrations were discussed.   In both cases the court, citing First Amendment protections, quashed requests for materials that would disclose membership lists and in *International Action Center*, lists of non-member volunteers.

Plainly, if a party is not required to produce the names of its organization's members and non-member volunteers a non-party such as the NLG-NYC cannot be compelled to provide materials that would disclose the names of NLG legal observers and/or non-member volunteer legal observers.

Finally, as set forth in the Bentley declaration, disclosure of legal observer notes to the government would discourage the political organizations who utilize NLG legal observers from associating with the NLG in the future.

## **CONCLUSION**

WHEREFORE, for all the foregoing reasons, this Court should issue an order:

a. granting the motion to quash and denying the City's motion to enforce;

b. awarding a reasonable attorney's fee;

c. granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
     April 10, 2008

Respectfully submitted,
/s/
ROBERT J. BOYLE
RB-3568
299 Broadway
Suite 806
New York, N.Y. 10007
(212) 431-0229
Attorney for NLG-NYC