```
UNITED STATES DISTRICT COURT                  (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
JULIA R. COHEN,                     : 05 Civ. 6780 (RJS) (JCF)
                                    :
             Plaintiff,             :         MEMORANDUM
                                    :         AND   ORDER
     - against -                    :
                                    :
THE CITY OF NEW YORK, a municipal   :
entity, NEW YORK CITY POLICE        :
OFFICERS STEVEN CHOINSKI, Shield    :
# 28673, and "JOHN DOES" and "SALLY :
ROWES," individually and in their   :
official capacities, JOSEPH         :
ESPOSITO, individually and in his   :
official capacity as Chief of the   :
New York City Police Department,    :
RAYMOND KELLY, individually and in  :
his official capacity as New York   :
City Police Commissioner, BRUCE     :
SMOLKA, individually and in his     :
official capacity as an Assistant   :
Chief in the New York City Police   :
Department and in Patrol Borough    :
Manhattan South,                    :
                                    :
             Defendants.            :
- - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

This is one of many cases arising from the arrests of approximately 1,800 people during the Republican National Convention (the "RNC") in New York City in the summer of 2004. The City of New York and the individual defendants (collectively, the "City") seek discovery from the New York City Chapter of the National Lawyers Guild (the "Guild") and I-Witness Video ("I-Witness"), who arranged for legal observers and videographers to document police activity at protests during the RNC. The City

1

requests the following discovery: (1) disclosure of the names of the videographers who filmed three videos as well as leave to subpoena the original videotapes and potentially to depose the videographers; (2) disclosure of the names of the plaintiffs and witnesses who contributed relevant videos to I-Witness or legal observer notes to the Guild; (3) leave to subpoena Aimee Jennings, a videographer; and (4) production of the "video portion" of an index possessed by I-Witness and the Guild.

Background

I will assume the parties' familiarity with the background of this discovery dispute, as set forth in my earlier decision, Cohen v. City of New York, 255 F.R.D. 110 (S.D.N.Y. 2008).  As a result of that decision, I-Witness produced 278 videotapes to the City in May 2009.  (Letter of Harry Sandick dated Feb. 1, 2010 ("I-Witness Response") at 13 n.12; Letter of James Mirro dated Dec. 30, 2009 ("Def. Motion") at 1).  Additionally, the Guild produced certain documents legal observer notes, photographs, and witness statements to the defendants in January and July of 2009.  (Def. Motion at 5).  At the time, the parties stipulated to redaction of the names of videographers and legal observers.  Cohen, 255 F.R.D. at 122, 126.

On December 17, 2009, the City deposed Eileen Clancy, the President and sole employee of I-Witness.  (Deposition of Eileen Clancy dated Dec. 17, 2009 ("Clancy Dep."), attached as Exh. B to Letter of James Mirro dated Jan. 12, 2010 ("Def. Supp. Motion"), at

2

1, 17-18).  During the deposition, Ms. Clancy revealed that some RNC-related videos in the possession of I-Witness or others had not been produced during the May 2009 production.  (Clancy Dep. at 65-72).  Ms. Clancy explained that I-Witness had not turned over documents that she considered to be non-responsive to the City's requests, which included videos that did not show "protests, demonstrations or arrests" (Clancy Dep. at 66, 71) and those created by the New York Police Department.  (Clancy Dep. at 70-71, 78).  She further stated that I-Witness had not produced "a handful" of videos that were not a part of its "original collection."  (Clancy Dep. at 72).  These videos included those that she possessed on loan for a limited amount of time while she "did some consulting work for attorneys" as well as some that she "simply gave back" to a Guild volunteer without making a copy because she "didn't think that they were worthwhile to go into the collection."  (Clancy Dep. at 73-74).

Finally, Ms. Clancy mentioned one video in particular that did not become a part of I-Witness' permanent collection.  (Clancy Dep. at 80-81).  She testified that she had never seen the video, but had heard that it depicted a "man who was arrested for kicking [a] police officer on [a] motorcycle."  (Clancy Dep. at 81-83).  Later, I-Witness informed the City that Aimee Jennings was the videographer that shot that video.  (Def. Supp. Motion at 1).  After Ms. Clancy's deposition, I-Witness approached those who

possessed the previously undisclosed videos and turned over to the City all but the one possessed by Ms. Jennings.  (Letter of Harry Sandick dated Jan. 5, 2010 ("I-Witness Letter"), attached as Exh. A to Def. Supp. Motion, at 1-2).

When I-Witness made its original production of videos to the City in May 2009, the videos were labeled numerically and listed in a "video production appendix."  (Clancy Dep. at 230).  The numbers originated from a complex database that tracks videos, descriptions of videos, photographs, legal observer notes, the identities of videographers and legal observer teams, and other information "derived from [Guild] attorneys."  (Clancy Dep. at 224-34).  The Guild arranged for the creation of this database, which was developed by a Guild Information Technology specialist together with Ms. Clancy, Guild volunteers and Guild lawyers.  (Clancy Dep. at 225-26, 231, 233).  The database is currently in the possession of the Guild, and I-Witness has a copy that was made in 2005.  (Clancy Dep. at 235-36).

The discovery disputes currently at issue result from Ms. Clancy's deposition testimony and I-Witness' subsequent video production.

Discussion

    A.   The Scope of Discovery

Generally, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or

defense[.]"  Fed. R. Civ. P. 26(b)(1).  "Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept."  Condit v. Dunne, 225 F.R.D. 100, 105 (S.D.N.Y. 2004); see Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978); Convolve, Inc. v. Compaq Computer Corp., 223 F.R.D. 162, 167 (S.D.N.Y. 2004); Melendez v. Greiner, No. 01 Civ. 7888, 2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003).  "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  The burden of demonstrating relevance is on the party seeking discovery.  See Mandell v. Maxon Co., No. 06 Civ. 460, 2007 WL 3022552, at *1 (S.D.N.Y. Oct. 16, 2007).

Once relevance has been shown, it is up to the responding party to justify curtailing discovery.  Condit, 225 F.R.D. at 106; Melendez, 2003 WL 22434101, at *1.  "[T]he court must limit the frequency or extent of discovery" when:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

5

Fed. R. Civ. P. 26(b)(2)(C).

In assessing these considerations, "special weight [should be given] to the burden on non-parties of producing documents to parties involved in litigation." Travelers Indemnity Co. v. Metropolitan Life Insurance Co., 228 F.R.D. 111, 113 (D. Conn. 2005); see also Fears v. Wilhelmina Model Agency, Inc., No. 02 Civ. 4911, 2004 WL 719185, at *1 (S.D.N.Y. April 1, 2004) ("[T]he Court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on [a] nonparty."); Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44, 49 (S.D.N.Y. 1996) ("[T]he status of a witness as a nonparty to the underlying litigation 'entitles [the witness] to consideration regarding expense and inconvenience.'" (alteration in original)). Of course, "discovery should not simply be denied on the ground that the person or entity from whom it is sought is not a party to the action. . . . A better approach is for the court to take steps to relieve a nonparty of the burden of compliance even when such accommodations might not be provided to a party." Wertheim Schroder & Co. v. Avon Products, Inc., No. 91 Civ. 2287, 1995 WL 6259, at *6 (S.D.N.Y. Jan. 9, 1995).

> An evaluation of undue burden requires the court to weigh the burden to the subpoenaed party against the value of the information to the serving party. Whether a subpoena imposes an "undue burden" depends upon "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed."

6

Travelers Indemnity Co., 228 F.R.D. at 113 (quoting United States v. International Business Machines Corp., 83 F.R.D. 97, 104 (S.D.N.Y. 1979)); accord Bridgeport Music Inc. v. UMG Recordings, Inc., No. 05 Civ. 6430, 2007 WL 4410405, at *2 (S.D.N.Y. Dec. 17, 2007); Night Hawk Ltd. v. Briarpatch Ltd., No. 03 Civ. 1382, 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003).

    B.    Videos and Legal Observer Notes

        1.    Videographers of Specific Videos

The defendants request disclosure of the names of the individuals who shot videos identified as numbers 713, 735, and 740 they also seek leave to subpoena the original films from the videographers and if necessary; to depose them. (Def. Motion at 2-3). The defendants explain that these videos contain gaps that they find to be "suspicious." (Def. Motion at 1-2). They asseert that the gaps coincide with when police officers issued dispersal orders to demonstrators. (Def. Motion at 1-2). The defendants first wish to subpoena the original footage from the videographers. If they find that the same gaps exist or that the videographers no longer possess the original film, the request permission to depose the videographers about the creation, preservation, editing, copying, and chain of custody of the footage, as well as their personal observations of the events that occurred at the filmed locations, particularly during the gaps in the videos. (Def. Motion at 3).

Neither the plaintiffs nor the defendants have yet specified

which videotapes, if any, they intend to introduce in connection with dispositive motions or at trial, nor have they identified any dispute over the authenticity of any videotape. Consequently, it is still premature to seek the identity of videographers for purposes of authenticating the tapes. Furthermore, the extent that the City is seeking evidence generally about what occurred at various locations during the RNC -- such as whether dispersal orders were given -- its requests are duplicative of information already available through countless witnesses who have been deposed. See Fed. R. Civ. P. 26(b)(2)(C)(i) (court must limit discovery that is "cumulative or duplicative"). Particularly in light of the First Amendment concerns implicated by the defendants' demands, they have failed to show a sufficient need for the information requested. See New York State NOW v. Terry, 886 F.2d 1339, 1355 (2d Cir. 1989). Accordingly, this aspect of the City's application is denied.

    2. <u>Names of Videographers and Legal Observers</u>

 The defendants next request the disclosure of the names of plaintiffs and previously identified non-party witnesses who recorded the videos or took the legal observer notes that were produced during discovery. (Def. Motion at 4-5). They propose that they could use this identifying information to cross-examine and impeach plaintiffs or witnesses. (Def. Motion at 4). However, the City has had the opportunity -- through interrogatories and depositions -- to ask the plaintiffs and their witnesses whether

they shot any videos or authored any legal observer notes.

Under Rule 26(b)(2), courts "must limit the frequency or extent of discovery" if the information could be obtained through other sources that are more convenient and less burdensome, or if "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action."  Indeed, the City represented that it "served interrogatories and document requests on each and every plaintiff in the RNC cases; likewise defendants served subpoena[s] on a substantial number of non-party witnesses calling for both testimony and documents," including videotapes. (Def. Reply)at 13).  The defendants further explain that they "made a practice of examining the plaintiffs and non-party witnesses at their depositions about (1) any videotapes that they took; and (2) any documents that they authored."  (Def. Reply at 13).  In fact, they note that the plaintiff in this case, Julia Cohen, revealed during her deposition that she had been a legal observer and that she "testified about it at length."  (Def. Reply at 2).  Although the City complains that "[v]ery few tapes, and even fewer Legal Observer notes, were produced in response to [its] requests" (Def. Reply at 13), this vague representation, without more, is insufficient to warrant the relief requested.

   3.   <u>Leave to Subpoena Aimee Jennings</u>

The City learned during the recent deposition of Ms. Clancy that a videographer named -- later revealed as Ms. Jennings -- had taped an incident where a protestor attacked a police officer.

(Def. Supp. Motion at 1). Although Ms. Clancy is no longer in possession of the video and never saw the footage, she knew of its contents and was able to identify its owner. (Clancy Dep. at 80-83; Def. Supp. Motion at 1). Accordingly, the defendants now request permission to issue a subpoena duces tecum upon Ms. Jennings for the production of "any video that shows any protest, demonstration or arrest during the RNC and for her testimony if necessary." (Def. Supp. Motion at 1). Neither the Guild nor I-Witness oppose this request. In light of the City's recent discovery of this video's existence, the City may issue this subpoena without prejudice to any objection Ms. Jennings may ultimately raise.

    C.   <u>Video Database</u>

The City further requests the production of a redacted version of the "database," or "video index," that provides details about the RNC-related videos, including the identities of the videographers. (Def. Supp. Motion at 2-5). The proposed redaction would conceal the names of members of I-Witness who are not plaintiffs or identified non-party witnesses in the RNC litigation. (Def. Reply at 2 n.1). The defendants believe they are entitled to the video index portion of this database because (1) my prior order mandated this discovery, and (2) they want to "confirm that they have received all responsive materials from [I-Witness]." (Def. Supp. Motion at 4-5).

    I-Witness and the Guild contend that the "video index" is

10

attorney work product and therefore not subject to discovery. (I-Witness Response at 9-13; Letter of Robert J. Boyle dated Feb. 1, 2010 ("Guild Response") at 2-5).  According to Ms. Clancy's deposition testimony, the video portion of the database contains various notes and identifying information, including the names of videographers, and descriptions of the events depicted. (Clancy Dep. at 224-34).  The Guild asserts that the database mostly contains information unrelated to the videos and primarily includes information taken from evidence intake forms, which I previously held to be work product. (Guild Response at 2-4). See Cohen, 255 F.R.D. at 123-26.  Indeed, Ms. Clancy testified that the database was "primarily a Guild project," which she helped create in close collaboration with Guild attorneys and volunteers. (Clancy Dep. at 225-26, 231).

In my previous order, I directed I-Witness to "disclose any [of its own] documents that reflect the creation, alteration, or preservation of the videotapes, including any index of those tapes." Cohen, 255 F.R.D. at 122.  However, my order made clear that I-Witness was not required to turn over any documents placed in its possession by the Guild or that were subject to work produce immunity, such as notes, intake forms, cover sheets, and indexes. Id. at 123-26.  As a result, I-Witness provided the City with a numerical list, or index, of the videos it produced. (Clancy Dep. at 230).  Although this list did not provide as much additional information as the City may have preferred, it was sufficient to

11

satisfy my order.

Finally, the City's desire to "confirm" that the production of videos was complete is not a legitimate reason for this additional discovery. I-Witness acknowledged that its "failure to produce [a] handful of [responsive] videotapes was a good faith mistake that was quickly corrected as soon as the error was identified." (I-Witness Response at 13 n.12). There is no reason to believe that the production is not now complete. I-Witness adequately explained its misstep and took every action to remedy it. In addition, I-Witness has demonstrated a desire to comply thoroughly with the City's requests. (I-Witness Letter at 1-2). Accordingly, there is no basis for overcoming the work product protection that attaches to the video index.

<u>Conclusion</u>

For the reasons discussed above, the City's requests for further discovery are denied, except that the City is permitted to issue a subpoena duces tecum upon Aimee Jennings "for any video that shows any protest, demonstration or arrest during the RNC, and for her testimony if necessary."[1]

---

[1] The Guild requested an award of the attorneys' fees and costs that it incurred in connection with this motion. Because the defendants' motion, while largely unsuccessful, was not unjustified, the Guild's application is denied.

SO ORDERED.

_____
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       May 6, 2010

Copies mailed this date:

James I. Meyerson, Esq.
64 Fulton Street, Suite 502
New York, New York 10038

James Mirro, Esq.
Special Assistant Corporation Counsel
100 Church Street
New York, New York 10007

Harry Sandick, Esq.
Shulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022

Robert J. Boyle, Esq.
299 Broadway, Suite 806
New York, New York 10007